Slip Op. 12 - 88

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - -x
SALEM MINERALS INC.,                     :

                      Plaintiff,  :

             v.                   :    Court No. 07-00227

UNITED STATES,                           :

                      Defendant. :
- - - - - - - - - - - - - - - - - -x

Opinion & Order

[Upon cross-motions as to classification of "gold
 leaf vials", summary judgment for the plaintiff.]

Decided:  June 26, 2012


    Charles H. Bayar for the plaintiff.

    Stuart F. Delery, Acting Assistant Attorney General; Barbara
S. Williams, Attorney in Charge, International Trade Field Office,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (Saul Davis); and Office of the Assistant Chief Counsel,
International Trade Litigation, U.S. Customs and Border Protection
(Chi S. Choy), of counsel, for the defendant.


         AQUILINO, Senior Judge: This case contests classification

by U.S. Customs and Border Protection ("CBP") of merchandise

imported for the plaintiff from the People's Republic of China

under heading 7114 of the Harmonized Tariff Schedule of the United

States ("HTSUS") (2005), in particular subheading 7114.90.00

("Articles of goldsmiths' . . . wares . . .:  Of other precious

metal whether or not plated or clad with precious metal"), at a

rate of duty of 7.9% ad valorem.  The importer protested that the

goods should have been classified under subheading 7115.90.30

("Other articles of precious metal . . . : Other . . . Other:  Of

gold, including metal clad with gold . . . 3.9%).

        Upon CBP denial of the protest and liquidation of duties

at the higher rate, the plaintiff filed its summons and complaint.

The court's jurisdiction is predicated upon 28 U.S.C. §§ 1581(a),

2631(a).

                                    I

        Each side has filed a motion for summary judgment.  The

court has now perused the plethora of papers[1] each has filed in

---

        [1]  Among those docketed on behalf of the plaintiff are its
Motion for Summary Judgment, Opposition to Defendant's Cross-Motion
for Summary Judgment, Reply to Defendant's Opposition to Plain-
tiff's Motion for Summary Judgment, Motion for Oral Argument on
Cross-Motion for Summary Judgment, Motion for Leave to File Sur-
Reply Brief, and its Motion for Leave to File Supplement to Sur-
Reply Brief.

        As indicated, the defendant has responded with a Cross-Motion
for Summary Judgment and Opposition to Plaintiff's Motion for
Summary Judgment, a Reply to Plaintiff's Opposition to Defendant's
[Cross-]Motion for Summary Judgment, a Response to Motion for Oral
Argument By Plaintiff, a Response to Plaintiff's Motion for Leave
to File Sur-Reply Brief and to Plaintiff's Sur-Reply, and a
Response to Plaintiff's Motion for Leave to Supplement Plaintiff's
Sur-Reply.

        Upon due deliberation, plaintiff's aforesaid motions for leave
to file a sur-reply and to supplement it can be, and each hereby
is, granted.

        Given the content of the foregoing written submissions,
plaintiff's motion for oral argument can be, and it hereby is,
denied.

support thereof and come to conclude that summary judgment is indeed dispositive.  That is, there is no genuine issue of material fact that requires trial within the meaning of USCIT Rule 56 and teaching of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and their progeny.   The  dispute  is  simply  a  matter  of  law,  to  wit, interpretation of provisions of the HTSUS.

                                    A

        USCIT  Rule  56(h)(1)  states  that,  on  any  motion  for summary  judgment,  there  must  be  annexed  a  separate,  short  and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.  The convoluted statement the plaintiff has submitted herein hardly satisfies this requirement.  To attempt to extract from its matrix facts that obviously are apposite:

        . . . 5.  The . . . merchandise . . . imported by Salem
        Minerals  from  the  People's  Republic  of  China[]  is
        described on the Entry's commercial invoice as "gold leaf
        vials," and consists of a small glass vial filled with
        clear liquid and a small quantity of gold leaf fragments,
        topped with a "theme" cap featuring a small figurine, and
        affixed with a label.  . . .

    a.    The imported merchandise:

        (1)    is marketed and sold in the United States as a "gold vial";

        (2)    measures 2½"-2¾" high and 1½" wide;

                *   *   *

    b.    The constituent of the imported merchandise being the gold leaf fragments:

                *   *   *

        (2)    are derived from gold leaf;

        (3)    are procured from a gold leaf manufacturer;

        (4)    are very small in weight per vial . . .; and

        (5)    are not worked or formed during production of the imported merchandise.

                *   *   *

    c.    The constituent of the imported merchandise being the glass vial:

        (1)    is clear glass;

        (2)    is spherical in shape (approximately 1½" in diameter), with a flat base and a short threaded neck at the top;

        (3)    nominally holds 15 milliliters of liquid; and

        (4)    is of a type commonly used to package nail polish.

    d.   The constituent of the imported merchandise being the clear liquid:

        (1)  is an anionic solution . . .; and

        (2)  serves to magnify the appearance of the gold leaf fragments and allow them to float freely and prevent them from clumping.

    e.   The constituent of the imported merchandise being the "theme" cap:

        (1)  has a cylindrical lower section designed to fit over the threaded neck of the glass vial;

        (2)  has an upper, figurine section in the shape of a theme object, varying in size from up to ½" wide and up to ¾" high;

        (3)  is cast from high-tin alloy; and

        (4)  except for the "Mt. Rushmore" theme cap, is electroplated with 18k gold.

In further detail[,. . .t]he imported merchandise featured 19 different gold-plated theme caps(and the unplated Mt.Rushmore theme cap), evoking western, wildlife, San Francisco, and other themes.

\*    \*    \*

    f.   The constituent of the imported merchandise being the label:

        (1)  is crescent-shaped, approximately 1¼" long, and made from paper with a gold-colored foil overlay (without any gold content);

        (2)  has a top printed line that refers to the gold vial's gold content; and

    (3) has a second printed line that varies depending upon the intended market for the gold vial (and, to some degree, the theme top that it bears).

  6. Regarding the production process for the imported merchandise:

    a. Production of the unplated theme caps requires metalworking facilities (for casting) and appropriately skilled workers.

    b. Electroplating the theme caps requires electroplating facilities and appropriately skilled workers.

    c. Assembling the gold vials does not require specialized equipment, tools, machinery, or workers.

  7. Regarding the production costs for the imported merchandise:

    a. The gold leaf fragments are the single largest cost element, constituting approximately 38% of production costs; and

    b. The theme caps (if gold-plated) also constitute approximately 38% of production costs, divided approximately evenly between: (i) the high-tin allow and its casting, and (ii) the gold plate and its electroplating.

  8. Regarding the marketing and sale of the imported merchandise in the United States:

    a. The entities that purchase the imported merchandise at wholesale:

      (1) cater to the tourist/transient trade; and

      (2) do not include fine jewelry stores, interior decorators, or other high-end outlets.

    b.   The imported merchandise:

        (1)  sells at retail for approximately $6.00 per piece;

        (2)  is purchased at retail:

            (a)  primarily by tourists/transients on impulse;

            (b)  as a souvenir or small gift; and

            (c)  for its visible gold content embodied by the gold leaf fragments.

In the interest of contraction of the foregoing, the court has deleted plaintiff's citations to evidence proffered in support of the individual averments, but the court has looked at it and found backing.

Defendant's Response to Plaintiff's Statement of Material Facts as to Which There is No Genuine Dispute admits paragraphs 5(a)(2), 5(c), 5(d), 5(e)(1,2,3), 5(f), 6, 7 and 8(a) and 8(b)(1), supra. It admits in part paragraphs 5, 5(a)(1) and 5(e)(4) but denies 5(b) and 8(b)(2), either for lack of sufficient information or due to plaintiff's peculiar presentment.

Defendant's Rule 56(h)(1) statement in support of its cross-motion for summary judgment, in sum and substance, is counsel's attempt to digest the transcript of his pretrial deposition examination of plaintiff's founder and president. The

court has reviewed that transcript and does not find either it or
its attempted digest of sufficient moment to warrant its recitation
*in haec verba* herein.

      That is, the salient facts of this case are essentially
as presented by the plaintiff above, and which underlie its
resolution as a matter of law.

                                    B

      Plaintiff's complaint avers that CBP's denial of its
protest 3307-06-100042, which underlies this case, was predicated
upon earlier HQ 966983 (Oct. 24, 2004).  Defendant's answer admits
this averment, contending that the ruling "speaks for itself and is
the best evidence of its contents."  A copy has been produced that
states, in controlling part:

> 10.  For the purposes of heading 7114, the
> expression "articles of goldsmiths' or silversmiths'
> wares" includes such articles as ornaments, tableware,
> toilet-ware, smokers' articles and other articles of
> household, office or religious use.
>
>                       *    *    *
>
> The importer protests that heading 7114, HTSUS, does
> not describe the article because "goldsmith's [*sic*]
> wares" are those items made by a craftsman of the
> decorative or industrial arts.  We do not take such a
> narrow view of the term "goldsmith's [*sic*] wares."
> Rather, the article consists of a semimanufactured form
> of gold, namely gold leaf.  The gold has been worked and

fashioned into part of an ornamental souvenir.  Under
Chapter 71, note 10, ornaments are specifically covered
in heading 7114.  Since we find that heading 7114, HTSUS,
describes the article at issue, it cannot be more
specifically described by heading 7115, HTSUS, as an
"other article of precious metal.["]

Plaintiff's Exhibit I, third page.

This analysis is thus the focus of this case, as
discussed and developed by the parties' thorough memoranda of law
in support of their cross-motions.  In fact, Note 10, as published
in HTSUS Chapter 71 (and recited by CBP in its HQ 966983 above),
emphasizes via underscoring the wording "<u>articles of goldsmiths' or
silversmiths' wares</u>".  Explanatory Note ("EN") 71.14 attempts to
elucidate the scope of number 10, stating that, in general, goods
covered are larger than articles of jewellery within the purview of
Heading 71.13 and include (A) articles of tableware, (B) toilet
articles, (C) office or desk equipment, (D) smokers' requisites
(other than cigarette and other lighters, smoking pipes, cigarette
holders, etc.), (F) articles for religious use, and

> (E) Other articles for domestic or similar use, for
> example, busts, statuettes and other figures for
> interior decoration; jewel cases; table centre-
> pieces, vases, jardinières; picture frames; lamps,
> candelabra, candlesticks, chandeliers; mantlepiece
> ornaments, decorative dishes and plates, medals and
> medallions (other than those for personal
> adornment); sporting trophies; perfume burners,
> etc.

On its face, this explication does not encompass plaintiff's pieces

à la its Exhibit A, although the Explanatory Note concludes that

heading 7114

> also covers unfinished or incomplete articles of
> goldsmiths' or silversmiths' wares and identifiable parts
> of goldsmiths' or silversmiths' wares, for example,
> silver handles for tableware, silver backs for toilet
> brushes, etc.

(1)

Plaintiff's memoranda press for a "common meaning" of

goldsmiths' wares *viz*. "articles of household, office or religious

use" containing gold that has been genuinely smithed or "formed

into a useful shape."  Volume VI, page 659, of The Oxford English

Dictionary (2d ed. 1989) defines goldsmith as a "worker in gold,

one who fashions gold into jewels, ornaments, articles of plate,

etc."  Page 795 thereof defines smith as one who works in iron or

other metals, often compounded with prefixes like black-, copper-,

gold-, gun-, iron-, lock-, silver-, tin-.  See also Webster's Third

New International Dictionary Of The English Language, Unabridged,

p. 976 (3d ed. 1981):

> goldsmith  1:  an artisan who makes vessels, jewelry, and
> other articles of gold  2:  a manufacturer of and dealer
> in articles of gold.

Id. at 2151:

> smith: 1a: a worker in metals - often used in combination
> <gold*smith*> <iron*smith*> <platinum*smith*>

<u>Id</u>. at 2576:

> ware  1a:  manufactured articles, products of art or
> craft . . .: articles of merchandise . . . 2:  goods,
> commodities, manufactures, or produce of a specific class
> or kind . . .

<u>Cf</u>.  The  Random  House  Dictionary  of  the  English  Language,

Unabridged, p. 1608 (1st ed. 1969):

> ware  1. Usually, wares.  a.  articles of merchandise or
> manufacture; goods. . . .  2.  a specialized kind or
> class of merchandise or of manufactured article (usually
> used in combination). . .

Plaintiff's Exhibit O contains copies of pages 864-70 from volume

12 of The Dictionary of Art (J. Turner ed. 1996) that focus on

gold, the yellow metallic element, with an atomic weight of 197.2

and a specific gravity of 19.32.  It is stated therein that the

> long history of goldworking has led to the evolution of
> a large range of manipulative techniques.  These can be
> classified under three main headings:  forming, cutting
> and joining, and decorating.

<u>Ibid</u>. at 865.  Plaintiff's Memorandum of Law, page 16 digests the

discussion therein of those techniques as follows:

> Gold forming . . . principally include[s] casting to
> produce solid objects, and hammering/rolling/drawing to
> produce sheet, rod or wire.  Gold sheet can be further
> processed into hollowware by such techniques as blocking,
> raising, and spinning.

> Gold cutting . . . principally include[s] shearing, piercing, and sawing. Gold joining techniques principally include riveting (perhaps the oldest technique) and soldering (the most common modern technique).
>
> A wide range of decorative techniques is available to the goldsmith, the majority of them adaptations of constructional techniques. These techniques include granulation (tiny gold spheres arranged and soldered onto a gold surface), filigree (fine wirework, which can be backed or open), repoussé and chasing (high-relief and low-relief designs, respectively, using hammer-and-punch or rubbing/pushing tools), engraving (using small chisels to remove metal), and carving (related to engraving but with more metal removed).

Compare United States v. Olivetti & Co., 7 U.S. Cust. App. 46, 49, T.D. 36309 (1916) ("The potter, the glassmaker, the goldsmith, the weaver, the needlewoman, the lace maker, the woodworker, the jeweler, all produce things which are both artistic and beautiful"); Reardon v. United States, 11 Cust.Ct. 233, 238 (1922) (goldsmithing is among the "dependent" fine arts "whose object is to create form that shall minister to some utility"); Tutton v. Viti, 108 U.S. 312, 313 (1883) ("The evident intent of Congress, in putting a much lower duty on statues which are 'professional productions of a statuary or of a sculptor' than on other 'manufactures of marble,' is to encourage the importation of works of art, by distinguishing between the productions of an artist and those of an artisan or mechanic"); United States v. Baumgarten &

Co., 2 U.S. Cust. App. 321, T.D. 32052 (1911) (carved marble vase, made by a sculptor as a copy of an original in the Borghese collection, artistic skill having been employed in its production, is dutiable as a "sculpture" and not as a "manufactured" article); Plaintiff's Exhibit ZB (McGraw-Hill Dictionary of Art, p. 539 (B. Myers ed. 1969) (goldsmith's work is "[t]he artistic production of objects of precious metals . . . in the form of vessels, utensils and jewelry")).

(2)

Defendant's position is that the flakes of gold in plaintiff's goods are substantial and of paramount importance to them, such leaf is a semi-manufactured form that has been worked into ornamental souvenirs, "ornaments" are specifically covered in HTSUS heading 7114, and they are not more specifically described by heading 7115.

Congress is presumed not to have used superfluous words in a statute. Ameliotex, Inc., v. United States, 65 CCPA 22, 25, 565 F.2d 674, 677 (1977). Emphasizing that the language of the statute is "articles of goldsmiths' wares", and not simply "goldsmiths' wares", and that the "plain terms" of Note 10 and certain exemplars in the explanatory notes show that heading 7114

covers articles for display or ornamentation such as souvenirs, the defendant argues the statute could not have been intended to be limited to "utilitarian" goods "fashioned by" goldsmiths but rather "clearly" encompasses all articles "displayed in the home" that are composed wholly or partly of gold by virtue of Note 10 to Chapter 71.   See Defendant's Memorandum, pp. 16-18, citing Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788-89 (Fed.Cir.) (if terms are plain, the scope of a classification provision is clear), cert. denied, 488 U.S. 943 (1988).

        The defendant concedes that the electroplated gold caps are not themselves classifiable in heading 7114 due to Note 6 to Chapter 71[2].   The defendant maintains, nonetheless, that the entirety of the imported articles (including their caps and the gold flakes) still satisfy even the lexicographic definitions of "goldsmiths' wares" propounded by the plaintiff as well as Note 10 to Chapter 71 and that the articles in their entirety are theme

———————————————

        [2] It provides:

        Except where the context otherwise requires, any reference in the tariff schedule to precious metal or to any particular precious metal includes a reference to alloys treated as alloys of precious metal or of the particular metal . . . but not to metal clad with precious metal or to base metal or non-metals plated with precious metal.

"ornaments" consisting "of precious metals" that are indistin-
guishable from ornamental bottle stoppers or automobile hood
ornaments.  <u>See</u> Defendant's Memorandum, pp. 21-22, referencing,
<u>inter</u> <u>alia</u>, Vol. 1, Funk & Wagnalls New International Dictionary of
the English Language (Comp. ed. 1987), p. 543 (defining goldsmith
as "A worker in gold", which "would obviously include the solid
gold flakes portion of the vials and also the gold plated
ornamental themed stoppers").  According to the defendant,

> the undisputed record shows that the gold vials are sold
> as souvenirs for display on a desk, mantle or window.
> Thus, they are no different than the gold ornaments
> described by Note 10 and the <u>Explanatory Notes</u> for
> Heading 7114, precisely because they are sold as
> ornaments for display in the house - basically, in the
> same fashion as the articles specifically enumerated in
> Note 10 to Chapter 71 and in the <u>Explanatory Notes</u>.

<u>Id</u>. at 20 (underscoring in the original).


                               (3)

          The plaintiff argues that there is no evidence of record
to support such a characterization and that any use of the imported
merchandise is immaterial because the physical characteristics
alone preclude classification under heading 7114.  It argues the
imported gold-leaf vials exist to attract purchasers, not to
decorate or embellish anything.  By contrast, the plaintiff points
out, in none of the exemplars of Note 10 to Chapter 71 has gold

merely been packaged or contained; all feature gold that has been
formed into a useful shape beyond random pieces of gold leaf and
electroplated base metal.

It is rather defendant's interpretation, the plaintiff
argues, that would render parts of heading 7114 redundant.
Defendant's construction of goldsmiths' wares is either "articles
or goods made by a manufacturer of and dealer in articles of gold"
or "goods made by a worker in gold", each of which would include
both the gold leaf pieces contained in the imported merchandise and
its gold-plated theme-figurine cap.  But, as the plaintiff points
out, the first formulation is a tautology:  "articles of
goldsmiths' wares" are "articles made by someone who makes and
sells articles of gold", and the second formulation tends to
support construing "goldsmiths' wares" as gold formed into a useful
shape because, in the context of metals, "work" means more than
simply "make".

II

This court cannot conclude that plaintiff's goods as an
entirety landed within HTSUS heading 7114.  Note 10 to Chapter 71
limits articles of goldsmiths' wares to finished goods for
consumption, i.e., articles of household, office or religious use

(and, of course, goldsmiths also create gold jewelry).  See, e.g.,
McGraw-Hill Dictionary of Art, supra.  In this regard, defendant's
"hairbrush with a gold handle" example is telling:

> . . . The essential character of the brush is provided by
> the bristles, but the brush is classifiable in Heading
> 7114 because the gold handle is not a minor constituent
> of the brush.

Defendant's Memorandum, p. 12. Precisely.

        A hairbrush's bristles-and-base is not a goldsmith's
ware, but its gold handle is because that metal has been formed
into a "useful" shape.  Reference to goods "of" a given material or
substance means goods consisting wholly or partly thereof.  See
HTSUS GRI 2(b).  The gold hairbrush handle alone is classifiable in
heading 7114 as an "incomplete" article wholly "of goldsmiths'
wares", see EN 71.14, supra, and the gold-handled hairbrush, as an
entirety, is likewise classifiable under that heading because it is
an article partly of "goldsmiths' wares" that is not a minor
component.  Thus, contrary to defendant's implication, "articles
of" in heading 7114 does not mean that the gold component of the
article need not come within the common meaning of "goldsmiths'
wares", rather it means that heading includes not just goldsmiths'
wares per se but also articles that incorporate them as component
parts, e.g., the gold-handled hairbrush.

Gold leaf itself is a semi-manufactured form of gold.  It is created by "goldbeaters"[3], not goldsmiths, and would find classification in HTSUS subheading 7108.13.10 eo nomine[4].  The defendant argues the gold in plaintiff's vials is actually gold flake, which is a commodity marketed for a variety of uses

---

[3] The beating of gold into leaf developed as a distinguishable craft, with its own guild distinct from that of the goldsmiths. See Plaintiff's Exhibit P (Cullity, "The Art of the Gold Beater", Vol. 47-2 The Decorator, pp. 4-7 (1993)) and Plaintiff's Exhibit Q ("The History of Gold Beating: 5000 Years of Craftsmanship" reproduced in The Regilded Age: An Exhibition of Contemporary Gilded Art and Historic Gilded Objects, pp. 9-12 (1991)).

And "goldsmiths' wares" does not encompass the gold leaf produced by goldbeaters.

[4] The defendant asserts that such gold would not be so classi-fied because superior subheading 7108.13 limits gold leaf to "semi-manufactured forms".  HTSUS Chapter 71, Additional U.S. Note 1(b), allows classification thereunder only for gold leaf in "sheets", and it is clear that the gold-leaf fragments contained in plaintiff's merchandise are not sheets.  Defendant's Memorandum, p. 24.

While the Notes and Additional U.S. Notes to Chapter 71 do not define "sheets" of precious metals for purposes of that chapter, the HTSUS chapters for the principal non-ferrous base metals and articles thereof uniformly define "sheets" to include "[f]lat-surfaced products . . . coiled or not, of solid rectangular (other than square) cross section . . . of a uniform thickness, which are: . . . of a shape other than rectangular or square, or any size, provided that they do not assume the character of articles or products of other headings". See Ch. 74, Note 1(g) (copper); Ch. 75, Note 1(d) (nickel); Ch. 76, Note 1(d) (aluminum); Ch. 78, Note 1(d) (lead); Ch. 79, Note 1(d) (zinc); Ch. 80, Note 1(d) (tin). These definitions of "sheets" encompass irregularly-shaped metal pieces -- even small ones -- that have been rendered flat.

including sale in vials and globes as "gold flake vials" or "gold
flake" globes and sale for food or beverage decoration.   Be that
as it may, whether the gold in the vials can be characterized as
fragments, pieces, flakes, flecks, nuggets or powder, if imported
on their own they would not find classification in heading 7114.
Cf. NY N024842 (April 2008) (imported gold powder classifiable in
HTSUS 7108.11.0000, imported gold flakes and nuggets classifiable
under subheading 7108.12.5050). Moreover, as the defendant agrees,
"goldsmiths' . . . wares" excludes gold-plated articles in the
light of Note 6 to Chapter 71, supra footnote 2.   Thus, if the
goods at bar consisted solely of the gold-plated caps for the glass
vials, they would be classifiable under HTSUS subheading 8309.90.00
("Stoppers, caps and lids (including . . . screw caps . . .) . . .
of base metal: . . . Other").

        Plaintiff's goods herein lack any constituent component
that a goldsmith would make and cannot be concluded to be "more
than" the sum of their constituent parts.   See, e.g., Montgomery
Ward & Co. v. United States, 73 Cust.Ct. 187, 189 (1974); F.B.
Vandergrift & Co. v. United States, 43 Cust.Ct. 22, 25 (1959).
Taken as a whole, those "gold leaf vials" do not reach to the level
of the work, or the ware, of a goldsmith within the purview of
HTSUS heading 7114.   The gold floating within the vials has not

been "worked" by a goldsmith beyond its obvious, simple, beaten state (and regardless of "tweezing" and "blooming" within the anionic solution after immersion therein and also of defendant's arguments on lack of proof on complete production of the gold leaf pieces and/or whether they are "worked" upon insertion as well as whether the gold leaf pieces can be considered "waste or scrap").

The finished product results from simple assembly that ends up short of any goldsmithing. It is but a *tchotchke*, not something like creative exemplars of Explanatory Note 71.14.

### III

In view of the foregoing, the court concludes that plaintiff's merchandise is properly classifiable under HTSUS subheading 7115.90.30 (2005). Judgment will enter accordingly.

So ordered.

Decided: New York, New York
         June 26, 2012


                                        /s/ Thomas J. Aquilino, Jr.
                                              Senior Judge

## J U D G M E N T

UNITED STATES COURT OF INTERNATIONAL TRADE

Thomas J. Aquilino, Jr., Senior Judge

- - - - - - - - - - - - - - - - - - -x
SALEM MINERALS INC.,                   :

                    Plaintiff,  :

          v.                   :   Court No. 07-00227

UNITED STATES,                         :

                    Defendant.  :
- - - - - - - - - - - - - - - - - - -x


          This case having been duly submitted for decision; and
the court, after due deliberation, having rendered a decision
herein;  Now therefore, in conformity with said decision, it is

          ORDERED, ADJUDGED and DECREED that defendant's cross-
motion for summary judgment be, and it hereby is, denied; and it is
further

          ORDERED, ADJUDGED and DECREED that plaintiff's motion for
summary judgment be, and it hereby is, granted; and it is further
hereby

          ORDERED, ADJUDGED and DECREED that the merchandise that
underlies this case is correctly classifiable under subheading
7115.90.30 of the Harmonized Tariff Schedule of the United States
(2005); and it is further hereby

ORDERED that Customs and Border Protection, United States Department of Homeland Security, reliquidate any entries of said merchandise that have not been liquidated under the aforesaid HTSUS subheading and refund to the plaintiff any excess duties paid, together with interest thereon as provided by law.

Dated:  New York, New York
        June 26, 2012


                                    /s/ Thomas J. Aquilino, Jr.
                                        Senior Judge